## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO.  9:19-CV-80196-BLOOM/REINHART

MARTIN E. O'BOYLE; JONATHAN O'BOYLE;
WILLIAM RING,

     Plaintiffs,

v.

TOWN OF GULF STREAM,

     Defendant.

_____

### SECOND AMENDED COMPLAINT

Plaintiffs Martin E. O'Boyle ("Mr. O'Boyle"), Jonathan O'Boyle, and William Ring (sometimes referred to collectively as "Plaintiffs") sue Defendant Town of Gulf Stream ("Gulf Stream" or the "Town") and allege as follows:

### NATURE OF THE ACTION

1.     Chartered in 1925, the Town of Gulf Stream is a highly affluent beachside residential community in Palm Beach County, Florida.  Comprising about 537 acres, the Town had 880 residents as of 2018, according to the U.S. Census Bureau.  Gulf Stream has long been governed by a small group of public officials who rarely face contested elections and whose tenures often last decades.  For example, the mayor appointed in 1966 served in that capacity until his death in 2012.  Mr. O'Boyle has been a resident of the Town since the early 1980s.

2.     This case centers on a long-running dispute between a citizen and his local officials—many of whom have little tolerance for dissent.  Pursuant to his rights guaranteed under the First Amendment to the United States Constitution, the citizen, Mr. O'Boyle, has engaged in speech critical of local officials and sought election to the Town Commission.  Mr. O'Boyle also has exercised the rights guaranteed to him under the First Amendment, and the Constitution of the State of Florida and Florida Statutes, to seek access to public records and to

petition the courts for judicial redress when those rights were unlawfully denied.  As a direct

result of the exercise of these rights by Mr. O'Boyle and the other plaintiffs associated with him,

Town officials adopted a pervasive and longstanding unlawful, official policy of intimidation

and retaliation against Mr. O'Boyle and the other plaintiffs, and they have repeatedly executed

this unlawful policy in public over the past seven years.

        3.      The Town's policy of intimidation and retaliation executed against the Plaintiffs

has taken various forms over the years, including unlawful threats of criminal and civil penalties

for continued exercise of their First Amendment rights and baseless criminal and civil

proceedings.  Despite paying two settlements to Mr. O'Boyle in 2013 and 2016 arising from this

retaliatory conduct, the Town has continued to refine and execute an unlawful, official policy of

intimidation and retaliation against Mr. O'Boyle and Plaintiffs.

        4.      This lawsuit is based on the latest three instances in which the Town executed its

unlawful, official policy designed to silence Plaintiffs.  <u>First</u>, the Town initiated a baseless and

retaliatory lawsuit pursuant to the Racketeer Influenced and Corrupt Organizations ("RICO")

Act, 18 U.S.C. §§ 1961-1968 that accused Plaintiffs of engaging in unlawful racketeering

activity through the act of making multiple public records requests and suing to enforce the right

of access to such records guaranteed by the Florida Constitution and the Florida Public Records

Act..  *Town of Gulf Stream v. O'Boyle*, 2015 U.S. Dist. LEXIS 84778 (S.D. Fla., June 30, 2015)

(dismissing RICO lawsuit), *aff'd* 654 Fed. App'x 439, 2016 U.S. App. LEXIS 11183 (11th Cir.

Fla., June 21, 2016).  The Town similarly, and contemporaneously with the RICO suit, filed

counterclaims against Plaintiffs in at least five then-pending public-records lawsuits filed by Mr.

O'Boyle and others, seeking judicial determinations that the Plaintiffs' public-records requests

and litigation were unlawful and enjoining Plaintiffs from further exercising their right of access

to public records.  Second, determining that the strategy against Mr. O'Boyle should include an attack against his lawyers, and especially a strike against Mr. O'Boyle's son, the Town filed a series of meritless complaints with The Florida Bar against Plaintiff Jonathan O'Boyle and members of the O'Boyle Law Firm, including Plaintiff William Ring.  Third, the Town pressed meritless disorderly conduct, resisting arrest without violence and trespass charges against Mr. O'Boyle, and twice sought, unsuccessfully, to have him declared incompetent.

5.     The Town authorized such conduct as a matter of an unlawful, official policy its leaders approved specifically to intimidate and silence Plaintiffs in retaliation for, among other protected activity, speaking out against Town leaders and criticizing Town policies.  The Town's conduct to carry out that unlawful, official policy is therefore actionable under the decision of the United States Supreme Court in *Lozman v. City of Riviera Beach*, 138 S. Ct. 1945, 1954 (2018).

## JURISDICTION AND VENUE

6.     Plaintiffs bring this action pursuant to 42 U.S.C. § 1983, Florida common law, and the First Amendment as incorporated by the Fourteenth Amendment.  The Court thus has jurisdiction under 28 U.S.C. § 1331.

7.     Venue is appropriate in this judicial district under 28 U.S.C. § 1391(b) because the events that give rise to this complaint occurred in this district.

## PARTIES

8.     Plaintiff Martin O'Boyle is now and at all times pertinent was a resident of the Town of Gulf Stream, Palm Beach County, Florida, which is located in the United States and within the Southern District of Florida.

9.     Plaintiff Jonathan O'Boyle is a resident of Florida, residing in Broward County.

10.     Plaintiff William Ring is a resident of Florida, residing in Broward County.

11. Defendant Gulf Stream is a municipal corporation of the State of Florida seated in Palm Beach County within the Southern District of Florida.

## GENERAL ALLEGATIONS

12. This action specifically seeks redress for the most recent retaliatory acts by the Town executed by its officials in furtherance of the Town's unlawful official policy of intimidation and retaliation against Plaintiffs. The Town's efforts to apply this official policy of intimidation and retaliation has unfolded over seven years and is rooted in a conflict occurring more than 30 years ago. This history is necessary context for understanding the continuing and ongoing unlawful, official policy of retaliation by the Town.

A.   **Foreshadowing of Retaliation to Come.**

13. Mr. O'Boyle moved into the Town in the early 1980s. His first experience with Town retaliation occurred in the mid-eighties, when he was developing residential real estate in the Hidden Harbor district of the Town and wanted to sell a custom home he had built. Mr. O'Boyle, who often bought and sold his company's properties himself, erected a sign in the Hidden Harbour district stating "Open House Custom Home" and listing the address. The sign was stolen overnight. Mr. O'Boyle replaced it, and that sign disappeared too. The cycle continued several more times. After about a half-dozen signs had disappeared in the night, Mr. O'Boyle spoke with Mayor Koch, who happened to be the premier real estate agent doing business in the Town. The mayor insisted that Mr. O'Boyle list the home with the mayor's real estate company. Mr. O'Boyle respectfully declined.

14. Mr. O'Boyle also reported the sign thefts to the Town Police, who despite telling Mr. O'Boyle that law enforcement officers had set up an overnight stakeout, were unsuccessful at catching the thief. Ultimately, however, Mr. O'Boyle discovered a collection of his stolen

signs at the Town's garage.  A public works employee confessed to Mr. O'Boyle that the Town's police chief and Mayor Koch had instructed him to take the signs.

15.      Mr. O'Boyle exchanged angry words with Mayor Koch.  Among other things, Mayor Koch warned Mr. O'Boyle that a Town ordinance required that real-estate signs contain only the owner's name and the address of the property.  When Mr. O'Boyle replaced his sign again, pursuant to a permit he had obtained from the Town, he was arrested for violating the ordinance. Town Attorney John Randolph failed to secure a conviction, however. With the dispute resolved in Mr. O'Boyle's favor, he was able to keep the signs up and, as a result, sold the house shortly thereafter.

16.      Mayor Koch continued to serve until 2012 and continued to operate a real estate agency conducting business in the Town.  Koch's successor, Mayor Joan Orthwein, had served with Koch as a Town Commissioner for over 15 years and was employed as a real estate agent with Mayor Koch's company.  Mr. Randolph continues to serve as Town Attorney for Gulf Stream.

**B.      The Established Unlawful, Official Policy of Retaliatory Conduct in Response to Critical Speech and Public Records Requests.**

17.      After his first confrontation with Town officials for posting real-estate signs, Mr. O'Boyle largely did not involve himself in community affairs, focusing his energy on his private business and family.  Within the last decade, however, Mr. O'Boyle became increasingly involved in his community, frequently and publicly criticizing the Town's political leaders for failing to follow the law and for failing to act, as Mr. O'Boyle saw it, in the best interests of Town residents and taxpayers.

18.      Mr. O'Boyle similarly has relied upon his rights under Florida's robust public records law, as guaranteed by the Florida Constitution and by Chapter 119, Florida Statutes, to

seek access to public information regarding matters such as the Town's governance and relating to its unlawful, official policy of retaliating against him personally.  The Town's failure and refusal to fulfill its constitutional and statutory obligations to provide Mr. O'Boyle with timely access to public records has forced Mr. O'Boyle and Plaintiffs to sue the Town repeatedly to enforce the law—often successfully.  Indeed, no court has ever found a public records lawsuit filed either by Mr. O'Boyle or by one of his corporate entities to be frivolous or brought in bad faith.

19.     Mr. O'Boyle's exercise of his right to petition his local government and to criticize its officials led the Town to institute an unlawful, official policy of intimidation and retaliation against Mr. O'Boyle, and those officials and Town employees have executed the unlawful, official policy through several steps, in an ongoing course of conduct, in an effort to silence an outspoken critic.

### Town Officials Seek To Suppress Mr. O'Boyle's Political Speech On His Own Property, Then Later Apologize For Their Misconduct.

20.     In spring 2013, Mr. O'Boyle needed something from the Town—approval for a renovation project at his home.  Mayor Orthwein, who had recently succeeded Mayor Koch, declared that she disliked the style of the proposed renovation, and the Town improperly denied Mr. O'Boyle's application by a 3-2 vote.  At the same time as he sought judicial relief, Mr. O'Boyle requested public records related to the Town's decision-making process. To attract public attention to his grievances against Town officials and in an effort to win public support for his cause, Mr. O'Boyle posted images on the side of his home mocking Town officials, examples of which are shown below:





21.     In doing so, Mr. O'Boyle followed the long American tradition under the First

Amendment of using satirical cartoons to poke fun at public officials who O'Boyle believed

were denying his property rights and acting contrary to the public interest.[1]

---

[1] *See, e.g.*, *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46, 53-54 (1988) ("'The political cartoon is a weapon of attack, of scorn and ridicule and satire; it is least effective when it tries to pat some politician on the back. It is usually as welcome as a bee sting, and is always controversial in some quarters.'") (quoting Long, The Political Cartoon: Journalism's Strongest Weapon, *The Quill* 56, 57 (Nov. 1962)). Indeed, in 1789, "George Washington was once depicted on a donkey led by his aide David Humphreys

22.     In response to Mr. O'Boyle's protected expression, the Town demanded that he remove the images and their critical messages, and Town leaders threatened him with jail time and fines if he refused.  The supposed crime, according to Town leaders, was failing to follow the Town's sign ordinance, failing to obtain a permit, and using unauthorized colors to paint the images.  Mr. O'Boyle refused to remove the images, and the Town cited him for these alleged violations.  Ultimately, the Town dropped all of these meritless allegations except for the charge that O'Boyle's cartoons used colors not authorized by the Town—itself a pre-textual and invalid charge because the ordinance at issue merely restricted painting that changed the predominant color of the exterior walls of a house.

23.     Mr. O'Boyle sued the Town pursuant to 42 U.S.C. § 1983, asserting that the Town violated his First Amendment right to free speech.  In July 2013, the Town and Mr. O'Boyle settled all of their disputes—the section 1983 action, the certiorari petition arising from the Town's denial of Mr. O'Boyle's renovation application, and 16 public records enforcement actions.  Under the terms of the settlement, the Town: 1) agreed to enter into a Development Agreement with Mr. O'Boyle permitting him to renovate his home in the manner requested and to allow certain future improvements; 2) paid Mr. O'Boyle $180,000; and 3) apologized to him. As part of the apology, the Town stated that it "recognizes the stress and strife that the O'Boyle family has endured as a result of the Town's conduct" and acknowledged that it was "indebted to O'Boyle for the many deficiencies in connection with the Town code that he has identified," and stated the Town Commission's "belie[f] that O'Boyle's actions will ultimately result in Gulf Stream being a better and friendlier place to live."

---

over the caption, 'The glorious time has come to pass/When David shall conduct an ass.'" S. Hess and M. Kaplan, The Ungentlemanly Art: A History of American Political Cartoons 61 (1968)." (cited *in Falwell v. Flynt*, 805 F.2d 484, 487 (4th Cir 1986)).

24.     Rather than learning its lesson from this loss and ending its unlawful, official policy of intimidation and retaliation against Mr. O'Boyle's First Amendment activity, the Town doubled down and continued that policy and practice.

**Town Officials Undermine Mr. O'Boyle's 2014 Election Campaign.**

25.     The Town's unlawful, official policy of retaliation against Mr. O'Boyle for the exercise of his rights took on a new and heightened dimension in early 2014.  In February of that year, Mr. O'Boyle announced his candidacy for a seat on the Town Commission. He was one of six declared candidates seeking election to the five-member governing board in what was the first contested election in Gulf Stream in 21 years.  Mr. O'Boyle was the only "outsider" candidate: the other five candidates were incumbents or, like Scott Morgan, already in positions of elected Town leadership, and Mr. O'Boyle was the only candidate not endorsed by the Town Civic Association (whose membership comprises a majority of the Town), despite the fact that he was a founding member.

26.     During the campaign, Mr. O'Boyle advertised his candidacy to voters with campaign signs and other ads.  His campaign signs were placed throughout the Town, including on public property.  Mr. O'Boyle also hired airplanes to fly banners over the Town promoting his candidacy.

27.     Town officials responded not just with electoral counter-speech through their own campaigns, but also through the execution of their unlawful, official policy of intimidation and retaliation against Mr. O'Boyle for daring to run for public office.  Then-Mayor Orthwein had explained that Mr. O'Boyle, as an outsider, was the least known of the candidates and that Town officials intended to keep it that way.

28.     For example, pursuant to the unlawful, official Town policy of intimidation and retaliation, Town Manager William Thrasher ordered police to remove Mr. O'Boyle's campaign signs, which were later found in a dumpster behind the Town Hall.  The Town destroyed, or forced Mr. O'Boyle to remove, dozens of signs promoting his candidacy.  Meanwhile, while other candidates also had some of their campaign signs removed by the Town, such instances were rare.  Further, no candidate other than Mr. O'Boyle was expressly singled out for enforcement, no other candidate was cited for their sign placements, and no residents who allegedly were displaying their signs in violation of the Town ordinance were cited.

29.     Likewise, on Election Day, Mr. O'Boyle sought to post banners near his truck, which was parked outside Town Hall.

30.     Town officials further executed their unlawful official policy of silencing Mr. O'Boyle by having the Chief of Police demand that Mr. O'Boyle remove almost all of his signs and banners, allowing him to display only two signs, despite the fact that Mr. O'Boyle was not obstructing traffic to Town Hall and was complying with the requirement that candidates refrain from campaign activity within 100 feet of the polling location.  Despite Mr. O'Boyle's compliance with the law, the Chief of Police insisted that the candidate had too many signs and would incite a disruption. On the Chief of Police's orders, officers confiscated all but two of Mr. O'Boyle's election-day signs.

31.     Mr. O'Boyle lost the election.

32.     Mr. O'Boyle sued the Town pursuant to 42 U.S.C. § 1983 for its unlawful retaliation against his Town Commission candidacy and his speech supporting it.  Once again, as the Town had previously done after retaliating against Mr. O'Boyle for posting satirical cartoons,

the Town realized the merit of Mr. O'Boyle claim and agreed in 2016 to pay him a settlement of $145,000.

33.     Nevertheless, the Town decided to ramp up its official policy of intimidation and retaliation against Mr. O'Boyle's First Amendment activity.  Its leaders, and specifically, newly appointed Mayor Scott Morgan, decided to double down and on that policy and practice by designing and carrying out a new, scorched-earth tactic intended by Mayor Morgan to silence Plaintiffs' protected activities for good.

**C.     The Town Has Continued Its Unlawful, Official Policy and Practice of Intimidating And Retaliating Against Mr. O'Boyle—And Extended That Policy to Jonathan O'Boyle and William Ring.**

34.     Throughout the course of his adversarial dealings with the Town and its officials, Mr. O'Boyle has frequently exercised his right to seek public records from the Town to learn more about its leaders' misconduct.  In doing so, Mr. O'Boyle, with the help of his son, Jonathan O'Boyle, and longtime employee and counsel, William Ring, has relied on the strong right of access to public records guaranteed by the Florida Constitution and the Florida Public Records Act, Chapter 119, Florida Statutes.

35.     The Town has over the years repeatedly violated the public records law by ignoring Mr. O'Boyle's requests, denying them, dragging out the required production of responsive documents or charging excessive fees in an effort to discourage Mr. O'Boyle's rights of access.  For example, when Mr. O'Boyle requested access to public records that might have benefited his candidacy for a seat on the Town Commission, the Town unlawfully delayed compliance with those requests until after the March 12, 2014 election.

36.     Mr. O'Boyle exercised his statutory right to hold the Town leaders accountable. Since January 2014, he or his companies and organizations have filed more than a dozen public-records actions against the Town seeking to enforce his constitutional and statutory rights of

access.  These actions often succeeded in causing the Town to produce public records it initially

had failed or refused to timely produce in compliance with O'Boyle's requests.

37.     Mr. O'Boyle's efforts have educated Town leaders about their responsibilities

under the public records law.  They have also led to positive developments in Florida law that

have strengthened the rights of all citizens to access public records.  For example, one of Mr.

O'Boyle's lawsuits against the Town led to the important precedent issued by the Florida Fourth

District Court of Appeal that public officials must proactively ask relevant employees or officials

to search for and provide "any public records stored in their private [e-mail or text message]

accounts that are responsive to a proper request." *See O'Boyle v. Town of Gulf Stream*, 257 So.

3d 1036, 1041 (Fla. 4th DCA 2018).

38.     Such efforts by Mr. O'Boyle threatened to continue to expose the Town's disdain

for the law and embarrass its leaders and elected officials.  As a result, Mayor Morgan—who ran

for Town Commission in 2014 on a platform based on silencing Mr. O'Boyle— was determined

to retaliate against these constitutionally protected activities.

**1.     The Town Takes A "Firm Stance" Against Plaintiffs By Bringing A Meritless RICO Action Against Them.**

39.     On June 2, 2014, the Town, through Mayor Morgan, circulated a letter to Town

residents announcing the Town's intention to take a "firm stance" designed to limit

Mr. O'Boyle's public-records actions against the Town.  Town leaders spent the next several

months with outside counsel finalizing the plan for that "firm stance" against Mr. O'Boyle's

exercise of his rights.

40.     Ultimately, the Town Commission decided to hire and authorize outside counsel

to file a RICO lawsuit against Mr. O'Boyle and others, including Plaintiffs Jonathan O'Boyle

and William Ring.  Thus, on February 12, 2015, the Town filed a federal class-action RICO

complaint against Plaintiffs and others.  Around the same time, the Town filed numerous counterclaims in Mr. O'Boyle's pending public-records lawsuits against the Town based on the same factual allegations as the RICO action.

41.     On June 30, 2015, the Honorable Kenneth Marra, United States District Court Judge for the Southern District of Florida, dismissed Gulf Stream's RICO action in its entirety, holding that the public records lawsuits filed by Mr. O'Boyle and his associates cannot, as a matter of well-settled law, constitute unlawful predicate acts necessary for a valid RICO claim. Instead, the Court ruled that such public-records suits are absolutely protected activity under Florida constitutional and statutory law.  *Town of Gulf Stream v. O'Boyle*, 2015 U.S. Dist. LEXIS 84778 (S.D. Fla., June 30, 2015).  The United States Court of Appeals for the Eleventh Circuit affirmed Judge Marra's decision on all grounds.  *See* 654 Fed. Appx. 439, 2016 U.S. App. LEXIS 11183 (June 21, 2016).

42.     Furthermore, on November 4, 2015, the Honorable Richard Oftedal, Circuit Court Judge of Florida's Fifteenth Judicial Circuit, dismissed with prejudice the counterclaim the Town had asserted against O'Boyle in *O'Boyle v. Town of Gulf Stream*, Case No. 502014CA004474. Judge Oftedal noted Judge Marra's ruling in the RICO action and found that the Town's similar state-court claims were similarly without merit, explaining that just as Mr. O'Boyle's use of the public records law "does not constitute a predicate act under RICO, it cannot, *under any scenario*, give rise to a cause of action or affirmative defense under any of the legal theories advanced by the Town."  The Town appealed and Florida's Fourth District Court of Appeal affirmed Judge Oftedal's decision in all respects and granted O'Boyle's motion for an award of attorney's fees against the Town.  *See Town of Gulf Stream v. O'Boyle*, Case No. 4D16-3634, 236 So. 3d 426 (Fla. 4th DCA 2017) (per curiam).

43.     These lawsuits were official acts in execution of the Town's continuing unlawful, official policy, in which the Town itself retaliated against Mr. O'Boyle and those associated with him in an effort to intimidate him.

44.     The meritless RICO suit and related state court counterclaims forced Plaintiffs to incur substantial attorneys' fees in their defense against the Town's retaliatory measures.

**2.      The Town Tries to Intimidate and Silence Mr. O'Boyle's Lawyers by Filing Meritless Bar Complaints Against Them.**

45.     Shortly after the Town's successful effort to thwart both Mr. O'Boyle's political advocacy during the 2014 election and his election to the Town Commission, and during the pendency of the public-records lawsuits, the Town pursued an additional angle as part of its unlawful, official policy of retaliation and intimidation.  The Town's outside counsel Robert Sweetapple in April 2014 was overheard telling another of the Town's outside counsel, Joanne O'Connor, that the way to successfully attack Mr. O'Boyle—*i.e.*, "the old man," as Mr. Sweetapple called him—would be to "go after the kid"—Mr. O'Boyle's son, Jonathan O'Boyle.

46.     Soon thereafter, Ms. O'Connor sought to disqualify Jonathan O'Boyle's law firm from representing Mr. O'Boyle in the pending public-records suit.  The Town then dropped the motion, only to file a motion for sanctions on roughly the same allegations—that Jonathan O'Boyle was engaged in the unauthorized practice of law—about one month later.  The Town supplemented the motion in late August 2014, but the court never issued a ruling on it.

47.     Meanwhile, on August 25, 2014, Mayor Morgan and the Town's private counsel filed complaints with The Florida Bar against Jonathan O'Boyle for alleged unauthorized practice of law.  The Town also authorized the filing of complaints with The Florida Bar against William Ring, and against *four other lawyers* who worked for Jonathan's law firm, The O'Boyle Law Firm, and who had filed and prosecuted public-records cases on behalf of Mr. O'Boyle or

companies he owns.  When one of the six lawyers subsequently stopped working on the public

records cases, the Town did not pursue the complaint against that lawyer.  The Town

supplemented its Bar complaint against Jonathan O'Boyle at least six times.

48.    The Town openly acknowledged that the Bar complaints were an official, Town-

authorized act of retaliation against Plaintiffs designed to prevent them from pursuing public

records.  In particular, the Town Commission on December 12, 2014, formally ratified the

Mayor's action in submitting the Bar complaints.  During that day's Town Commission meeting,

Mayor Morgan and the Town Commissioners publicly discussed the Bar complaints, the reasons

for pursuing them, and the fact that Jonathan O'Boyle sought to defend against the complaint for

unauthorized practice of law, in part, by arguing that the Town had not authorized the complaint

submission.  Anticipating Jonathan O'Boyle's defense, the Commission unanimously authorized

the conduct.  Vice Mayor Robert Ganger said to Town leaders that this was "precisely what we

expected to have happen."  Town Manager Bill Thrasher, meanwhile, explained that submission

of the Bar complaints were an integrated part of the Town's official (and unlawful) policy

designed to "protect our Town"—that is, to stop Plaintiffs from filing further public records

requests and enforcing their right to do so in court.

49.    The Bar complaints against Jonathan O'Boyle and William Ring were without

merit, and both were eventually dismissed.

50.    Mayor Morgan submitted *yet another* complaint to The Florida Bar against

Jonathan O'Boyle in 2017 based on the same alleged conduct with regard to the prosecution of

public records cases.  The Bar ultimately notified the Mayor that the matter had already been

resolved and that "continued disciplinary proceedings in this matter are inappropriate" and

closed its file:

May 23, 2017

Hon. Scott W. Morgan
Mayor Of The Town Of Gulf Stream
100 Sea Road
Gulf Stream, FL 33483

Re:     Complaint by Scott W. Morgan against Jonathan Reilly O'Boyle
        The Florida Bar File No. 2017-50,516 (17E)

Dear Mr. Morgan:

All correspondence and documents submitted in this matter have been carefully reviewed.  Mr.
O'Boyle himself was investigated for the unlicensed practice of law and has since remedied that
status, is now licensed in Florida, and The Florida Bar's unlicensed practice of law case was
closed in May 2015.  The underlying issues in your complaint have accordingly been resolved.

Accordingly, continued disciplinary proceedings in this matter are inappropriate and our file has
been closed.  Pursuant to the Bar's records retention schedule, the computer record and file will
be disposed of one year from the date of closing.

51.     The Town authorized these meritless Bar complaints in execution of its unlawful,

official policy of intimidation and harassment and with the express purpose of stopping

Mr. O'Boyle from pursuing lawful public records requests from the Town or enforcing those

requests through litigation when the Town denied or ignored them.  In particular, the Town

intended to and did try to deprive Mr. O'Boyle and his affiliated entities of their choice of

counsel to represent them in the pursuit of public records that the Town was withholding or had

improperly withheld in violation of the law.  Because of the family connection, Mayor Morgan

believed that Jonathan O'Boyle and his firm were providing discounted services that unfairly

subsidized Mr. O'Boyle's quest for public records, such that Mr. O'Boyle was not feeling the

usual financial pain of litigation in the public-records cases.  Mayor Morgan and the Town

believed that Mr. O'Boyle needed to feel such pain and that the Town should take measures to

force Jonathan O'Boyle's firm off the public-records suits.

### 3.     The Retaliatory Arrest and Continuing Criminal Prosecution of Mr. O'Boyle.

52.     On or about September 22, 2015, Mr. O'Boyle was confronted by the Gulf Stream

Police in the lobby of Town Hall immediately after a public Town meeting.  911 was called, and

Mr. O'Boyle was taken to the emergency room by ambulance.  Several days later, false criminal charges against O'Boyle were filed for retaliatory purposes at the Town's instance and direction. The charges were subsequently enhanced from disorderly conduct and resisting arrest without violence to trespassing in a public building.

53.    The Town continues to retaliate by pressing forward with these criminal claims and has encouraged the State Attorney to twice seek to have Mr. O'Boyle declared mentally incompetent and unable to defend himself.  Based on information and belief, these were the only times in the past decade that the State Attorney's Office for either the 15th Judicial Circuit or the 17th Judicial Circuit had filed a motion to declare a defendant incompetent.  These motions were baseless and were denied.

**D.    Throughout Their Campaign to Silence Plaintiffs, Town Officials Disclose Their Unlawful Motive Behind Their Policy and Conduct Against Plaintiffs.**

54.    From the beginning of their campaign against Plaintiffs, Town leaders made no secret of *why* they had authorized and were executing a policy of harassment and intimidation against Plaintiffs.

55.    As discussed above, Mayor Morgan had explained in a letter to Town residents on June 2, 2014, that the Town intended to take a "firm stance" against Mr. O'Boyle and his associates in response to their public-records requests and enforcement lawsuits.

56.    Four months later, on October 10, 2014, Mayor Morgan explained during a Town Commission meeting that he and other Town officials had designed a strategy to sue Plaintiffs into submission—to, as Mayor Morgan put it, "put a stop to the individual lawsuits on the public records requests."  He expressed confidence that the accomplishment of this objective would be the direct result of the RICO action, and in a letter to Town residents dated October 22, 2014,

Mayor Morgan predicted that the lawsuit "will end the threat" of further public records requests and lawsuits.

57.     In July 10, 2015, a few weeks after Judge Marra had dismissed the RICO lawsuit with prejudice, Mayor Morgan explained that, notwithstanding Judge Marra's ruling, "I want there to be no misunderstanding" about why the Town had orchestrated its campaign against Mr. O'Boyle and "these people" and that the Town would not let up until the public-records cases were withdrawn.

58.     Mayor Morgan again explained the Town's extortionate and unlawful policy of intimidation and retaliation against Plaintiffs was an official Town policy designed to force Plaintiffs to "discontinue their lawsuits" seeking public records.  If the Plaintiffs gave in and ceased exercising their rights, the Mayor continued, "I will recommend discontinuing our RICO action."  Mayor Morgan thus made it clear that the Town was not interested in prevailing on its action or recovering the damages it had asserted; instead, the only goal of the unlawful, official Town policy was to do what the Town's prior unlawful retaliation against Mr. O'Boyle had failed to do: silence him and prevent him from learning more about Town governance.

59.     The Town's unlawful motive was no less clear regarding its campaign to file meritless complaints with the Florida Bar against Mr. O'Boyle's counsel.  In particular, before filing those complaints against Mr. O'Boyle's lawyers, including his son, Jonathan O'Boyle, the Town's special counsel was overheard plotting a way to make their retaliation against him even *more* personal.  In particular, the Town's lawyers discussed how Mr. O'Boyle might relent and cease seeking public records and enforcing his right to do so if the Town also increased its pressure by going after his son. That line of attack ultimately took form in Mayor Morgan's filing of the Bar complaints against Jonathan O'Boyle and others working at the firm.

60.     By July 8, 2016, and even though the RICO suit and the related state court counterclaims had been soundly defeated pursuant to clear, controlling precedent, the Town appeared satisfied that its unlawful, official policy of retaliation and intimidation had been effective.  During that day's Town Commission meeting, Mayor Morgan explained that the Town had proceeded knowing well that there was no precedent for the RICO action—indeed, he said, explaining the predicted loss, "no municipality" had ever pursued such a lawsuit.  Even so, Mayor Morgan said the significant expenditure of taxpayer money was worth it: "we had to do something to try to stop the public records lawsuits" brought by O'Boyle and his associates, he said, adding that the effort to stifle them appeared to have worked.

61.     Mayor Morgan further boasted that Town leaders "knew" that they "would at least expose the case, and that's exactly what happened.  We have not had a public-records lawsuit since the day that RICO action was filed."  Finally, he expressed satisfaction that the Town had so successfully retaliated against Plaintiffs that not only had they been scared out of filing any public-records suits against the Town, but the Town had also succeeded in intimidating Plaintiffs from similarly exercising and enforcing their constitutional right of access to public records against "any municipality in the state."

62.     In conclusion, the mayor explained, "[t]he effect of that RICO action was exactly what we tried to accomplish: and that was to stop those lawsuits."  Finally, while he lamented that "public records requests themselves cannot be stopped" by the Town's unlawful retaliatory efforts, he expressed some satisfaction that that Plaintiffs appeared to have submitted fewer requests to the Town since it filed the RICO action.

63.     In January 2017, Mayor Morgan was still boasting to Town residents that the Town's unlawful, official policy of intimidation against Plaintiffs had succeeded, even if the

litigation had not: "Gulf Stream has not had another public records lawsuit against it in over two years."

## COUNT I

**Retaliation in Violation of First Amendment (42 U.S.C. § 1983)—Defendant Gulf Stream**

64.     Plaintiffs adopt and incorporate by reference the foregoing allegations in as if fully set forth here.

65.     Plaintiffs have a right to and did engage in activity protected by the First and Fourteenth Amendments to the U.S. Constitution by speaking out on matters of public concern relating to the Town, petitioning Town leaders at public meetings and elsewhere, and seeking redress in the courts in lawful civil actions.

66.     The Plaintiffs' right to engage in those activities include the right to do so without fear that the Town would and will retaliate against Plaintiffs for doing so.

67.     The Town, through Mayor Scott Morgan, the other Town Commission members, and Town Manager William Thrasher, intentionally devised, initiated, and pursued an unlawful, official policy of intimidation against Plaintiffs, designed to intimidate them from further exercise of their right to petition the Town and their right to free speech. That Town policy of intimidation and retaliation took form in:

> a.     The Town's initiation of a meritless RICO class-action suit and related, meritless state court counterclaims against Plaintiffs;
>
> b.     The Town's filing of meritless complaints with the Florida Bar against William Ring, Jonathan O'Boyle, and other lawyers who represented Mr. O'Boyle; and
>
> c.     The Town's initiation of and continued pressing of a meritless criminal prosecution against Mr. O'Boyle.

68.     The Town, Mayor Morgan, Town Commissioners, and Town Manager Thrasher each intended their actions to punish and retaliate against Plaintiffs for exercising their First Amendment rights and to deter Plaintiffs (and others) from exercising such rights in the future.

69.     When so acting against Plaintiffs, the Town acted under color of state law as the final policymaker responsible for the conduct described in this Complaint. As such, the Town either expressly adopted all measures necessary to carry out the Town's intent or otherwise authorized, ratified, or adopted the conduct of Town representatives who carried out the policy while acting on the Town's behalf.

70.     The Town's unlawful, official policy of intimidation and retaliation against Plaintiffs, and the actions it undertook to execute that policy, as described above, constituted an attempt to deter Plaintiffs from exercising their rights under the First Amendment and would chill a person of ordinary resolve from doing the same.

71.     The Town's unlawful, official policy of intimidation and retaliation against Plaintiffs, and the actions it undertook to execute that policy, as described above, also caused Plaintiffs to suffer reputational harm, emotional distress, legal-defense costs, and other compensable injuries.

## **DEMAND FOR TRIAL BY JURY AND PRAYER FOR RELIEF**

Plaintiffs hereby demands a jury trial as to all issues triable by a jury.

**WHEREFORE,** Plaintiffs respectfully requests that this Court enter judgment against Defendant Town of Gulf Stream that includes:

A.     An award of special damages, in an amount to be proved at trial, arising from the attorneys' fees and costs incurred by or on behalf of Plaintiffs to defend against the Town of Gulf Stream's retaliatory conduct as described above;

B.      An award of general damages, in an amount to be proved at trial;

C.      Costs of suit;

D.      An award of Plaintiffs' attorneys' fees pursuant to 42 U.S.C. § 1988; and

E.      Such other additional relief as the Court deems just and proper.


Dated: May 8, 2020

                                    Respectfully submitted,

                                    ATHERTON GALARDI MULLEN & REEDER PA

                                    /s/ Martin Reeder
                                    L. Martin Reeder, Jr.
                                    Florida Bar No. 308684
                                    224 Datura Street, Suite 815
                                    West Palm Beach, FL 33401
                                    Telephone: (561) 293-2530
                                    Fax: (561) 293-2593
                                    martin@athertonlg.com

                                    BALLARD SPAHR LLP

                                    Charles D. Tobin (Fla. Bar No. 816345)
                                    Chad R. Bowman (admitted *pro hac vice*)
                                    1909 K Street, NW, 12th Floor
                                    Washington, DC 20006
                                    Telephone: (202) 661-2218
                                    Fax: (202) 661-2299
                                    tobinc@ballardspahr.com
                                    bowmanchad@ballardspahr.com

                                    *Counsel for  the Plaintiffs*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 8, 2020 I electronically filed the foregoing with the Clerk of the Court using the CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record on the below Service List via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Filing.

By: _/s/ Martin Reeder_
L. Martin Reeder, Jr.
Florida Bar No. 308684

## SERVICE LIST

Hudson Carter Gill
Jeffrey Lawrence Hochman
JOHNSON, ANSELMO, MURDOCH,
BURKE, PIPER & HOCHMAN, PA
2455 E. Sunrise Boulevard, Suite 1000
Fort Lauderdale, FL 33304
Tel.: 954-463-0100
Fax: 954-463-2444
Email: hgill@jambg.com
Email: hochman@jambg.com
_Counsel for Defendant, Town of Gulf Stream_

James J. McGuire
Mark R. Caramanica
Thomas & LoCicero PL
601 South Boulevard
Tampa, FL  33606
Tel.: 813-984-3060
Fax: 813-9843070
Email: jmcquire@tlolawfirm.com
Email: mcaramanica@tlolawfirm.com
_Counsel for Defendant Wantman Group, Inc._